Filed 10/21/21  P. v. Carr CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B309479 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. A923178) |
| v. | |
| PATRICK CARR, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Laura C. Ellison, Judge.  Reversed.

Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Patrick Carr appeals from an order denying his petition to vacate his murder conviction under Penal Code section 1170.95.[1] We reverse the order because, as Carr argues, he made a prima facie showing that he is entitled to relief and the trial court erred in denying his petition without issuing an order to show cause and holding an evidentiary hearing.  The record does not support the Attorney General's argument that the trial court had held an evidentiary hearing.

## BACKGROUND

In June 1988, the People charged Carr and two codefendants of robbery and murder.  Carr pleaded guilty to second degree murder.  The trial court sentenced him to prison for an indeterminate term of 15 years to life.

Following a jury trial, a jury convicted two of Carr's confederates—Van Otis Wilson and Joevone Elster—of the murder of George Aguilar.  (*People v. Elster et al.* (May 6, 1992, B047207), at pp. 2 [nonpub. opn.] (*Elster*).)  In Wilson and Elster's direct appeal from the judgment of conviction, this court described the facts as follows:

"In January 1988, defendant Elster was hired as a cashier at a Shell gasoline station . . . ." (*Elster*, *supra*, B047207, at p. 2.) "At that time, defendant Elster learned the owner's brother, Masih Madani [the robbery victim], collected the station's receipts every morning and took them to the bank." (*Ibid.*)  "At some point before March 28, 1988, defendant Elster solicited the participation of Lamont Wade (Wade) in a robbery; he [Elster] also asked a neighbor to contact Leslie Holget (Holget)." (*Ibid.*)

---

[1] Undesignated statutory citations are to the Penal Code.

On March 28, 1988, Wade, Elster, and Wilson parked across the street from the Shell Station to wait for Madani. Elster and Wilson again waited for the courier on March 29. "On March 30, 1988, this trio again took up an observation post behind the Shell station with the intent of robbing the courier." (*Elster*, *supra*, B047207, at p. 3.) "For some reason, the trio did not attempt a robbery on this occasion." (*Id*. at p. 4.) Wade then decided that he did not want to participate in the planned robbery.

On March 31, 1988, Holget drove Elster and Carr to a location near the gas station, and "Elster explained that he used to work at the Shell station; the courier should arrive at approximately 8:00 a.m. in a blue Acura, after which they would rob him in the parking lot. Holget was armed with a .44 Magnum; Carr, with a .25 caliber handgun. Approximately 20 minutes after arriving at the . . . parking lot [near the Shell station], this group met . . . Wilson and [Terrence] Gross who arrived in" another vehicle. (*Elster*, *supra*, B047207, at pp. 4–5.)

"The courier collected $1,912.59 in cash, as well as some checks; these items had been placed in a cloth bag which the courier in turn placed in the rear area of his 1986 Acura Integra. He then left the station. . . . Elster directed his companions to follow the Acura, stating they would rob it on the street. It was decided the group would place one automobile in front of the Acura and one behind it when it stopped at a traffic signal, at which point they would rob the courier. Thereafter, they would abandon the Acura a few blocks from the site of the robbery. . . ." (*Elster*, *supra*, B047207, at p. 5.)

When the courier stopped at a traffic signal, "Wilson and Holget stepped out of their automobiles and walked toward the

3

Acura, displaying handguns." (*Elster*, *supra*, B047207, at p. 6.) Wilson ordered the courier out of the Acura and Wilson and Holget drove away in the Acura. An off-duty Inglewood Police Sergeant George Aguilar pursued the Acura with the courier. Aguilar was able to pull alongside the Acura and "shouted several times that he was a police officer. In response, shots were fired from the Acura." (*Id.* at p. 7.) Aguilar later died from gunshot injuries.

### 1.    *Carr's pretrial police interview*

When interviewed by police officers, Carr reported that he knew about the robbery the night before it occurred. Carr told officers he took a gun with him to the robbery for personal protection. Carr reported that after the robbery he was supposed to follow Holget, but chose to go the other way because, "I didn't like it, just didn't like it."

### 2.    *Carr's testimony at Wilson and Elster's trial*

Carr testified at Wilson and Elster's trial. He stated that he had known Holget for a couple years. He further testified that on the night before the robbery, Holget told Carr Elster was planning a robbery and Holget wanted Carr to "watch his back." The group planned to rob a gas station where Elster formerly worked.

The next day, Holget, Elster, and Carr went in Holget's vehicle to Western and Manchester. Carr sat in the backseat and carried a gun. Carr testified Holget and Wilson also had guns.

Carr also testified that the group planned to rob the courier in the parking lot. As they waited for the courier, Wilson and someone Carr knew as "Baby Cookie" drove up. Carr asked Elster why Wilson and Baby Cookie were participating in the

4

robbery, and Elster reassured Carr, " 'There is enough funds for everyone.' "

After they waited a while, Carr "want[ed] out" but he stayed because he "was supposed[d] to watch [Holget's] back." Holget persuaded Carr to stay.

The group had planned to rob the courier inside the gas station but "[i]t just didn't happen" that way. Eventually, the group saw the courier drive off, and Elster said, " 'Follow that car.' " The group started to "chase the c[ou]rier down Manchester [Avenue]." Elster was driving one car and Wilson was driving the other.

The group was able to cut off the courier; Holget and Wilson exited their vehicles. Holget and Wilson both brandished firearms and ordered the carrier out of his car. Holget jumped into the driver's seat of the courier's car and Wilson jumped into the passenger seat. They then drove away with Holget turning left and Elster, who was driving with Carr, turning in the opposite direction. Carr understood he would receive 10 percent of the proceeds from the robbery.

### 3.    *Carr's section 1170.95 petition for resentencing*

On March 30, 2020, Carr filed a section 1170.95 petition for resentencing. Carr alleged that he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019. Carr also alleged he was not a major participant in the felony or he did not act with reckless indifference to human life during the course of the crime or felony.

In April 2020, the court appointed counsel for Carr. Counsel filed a brief arguing, "A prima facie case has been established; there is no evidence petitioner was the actual killer,

5

aided and abetted with the intent to kill . . . [and] he [was] not a major participant who acted with a reckless indifference to human life." The People opposed the petition, disputed Carr's contentions, and concluded that Carr had not stated a prima facie case that he could not be convicted of murder because of changes to sections 188 and 189.

### 4.    *Hearing and order*

The court set the case "for hearing pursuant to Penal Code section 1170.95(A)."

On August 18, 2020, the court "put this over for 11-17-20 for status. Just going to call it a status." At the November 17 "status" hearing, the court asked why Carr was not present and his counsel responded, "I don't think we're passed the prima facie [stage] at this point."

The court then indicated that Carr was "potentially eligible." There was a discussion whether the court was "[i]ssuing an order to show cause," but the court never expressly responded to that inquiry. Instead, the court stated it "thought" the case was set for an unspecified hearing. The court never actually issued an order to show cause or referred to a section 1170.95, subdivision (d)(3) hearing. The court did not ask if either party had additional evidence to present at such a hearing.

The prosecutor argued Carr was a major participant in the robbery who acted with reckless indifference to human life. Carr's counsel disagreed. Following argument, the trial court concluded: "I think it's reasonably foreseeable that an armed robbery in broad daylight in public in a residential [area] or in a busy gas station it's perfectly foreseeable that others might get involved to try to prevent i[t] and stop it, and that's what

6

happened here. I think it's very foreseeable to [defendant] that that would occur, and that's exactly what did occur.

"This robbery was not over. They had planned in advance to meet with guns, they had planned in advance, they changed the plans slightly not to rob him at the gas station, but to follow him to a different area, the area that would be potentially quieter than the gas station. They followed him in two separate cars. The plan at that point was to get the money and meet somewhere else to divide the money up.

"The only thing that changed in the plan was that the victim resisted, I guess, and somebody came to his aid. But that's all foreseeable that that would occur, and the defendant fully involved himself in this robbery. He was using deadly violence, prepared to use deadly violence with others he knew were also prepared to use deadly violence."

The trial court's posthearing minute order states that the "[p]etition pursuant to 1170.95(A) Penal Code is denied." The court explained: "Defendant Carr is just as guilty of this murder as any of the other persons who participated knowingly and willingly and intentionally and with absolute reckless disregard and as a major participant. Mr. Carr is a major participant and has absolute disregard for human life."

Carr timely appealed.

## DISCUSSION

Carr argues that the trial court engaged in improper factfinding at the prima facie stage. The Attorney General argues that the trial court "already conducted a subdivision (d)(3) hearing in which it properly engaged in fact finding and determined beyond a reasonable doubt that appellant was ineligible for resentencing." According to the Attorney General,

"There is no basis to hold another such hearing." We conclude the trial court did not hold a section 1170.95, subdivision (d)(3) hearing, and we cannot conclude from the record that as a matter of law, Carr was ineligible for relief under section 1170.95. Accordingly, we remand the matter to the trial court for a section 1170.95, subdivision (d)(3) hearing.

## A.    Legal Background

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) amended section 188 to provide that "[e]xcept as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (Stats. 2018, ch. 1015, § 2.) The amendment effectively "eliminates natural and probable consequences liability for first and second degree murder." (*People v. Gentile* (2020) 10 Cal.5th 830, 849 (*Gentile*).) In addition, Senate Bill No. 1437 enacted section 189, subdivision (e), which restricted felony murder liability to cases in which the defendant was the actual killer, acted with the intent to kill, or was a major participant in the underlying felony and acted with reckless indifference to human life. (Stats. 2018, ch. 1015, § 3; see *Gentile, supra*, 10 Cal.5th at pp. 842–843.)

A person convicted of murder under a felony murder or natural and probable consequence theory may petition to have the murder conviction vacated. (§ 1170.95, subd. (a).) The petitioner's prima facie case consists of the following three elements:

"(1)  A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed

under a theory of felony murder or murder under the natural and probable consequences doctrine.

"(2)  The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder.

"(3)  The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019."  (§ 1170.95, subd. (a).)

When a petitioner files a "complying petition," the court must appoint counsel if requested, "the issue is briefed[,] and then the court makes one (not two) prima facie determination." (*People v. Lewis* (2021) 11 Cal.5th 952, 966 (*Lewis*).)  "[T]he prima facie inquiry . . . is limited.  Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved.  If so, the court must issue an order to show cause." '  [Citation.]  '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citation.]"  (*Id.* at p. 971.)  At the prima facie stage, the trial court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'  [Citation.]"  (*Id.* at p. 972.)

"If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause."  (§ 1170.95, subd. (c).)  In that event, the court must hold a hearing within 60 days to determine whether to vacate the murder conviction.  (*Id.*, subd. (d)(1).)  At this third and final stage of the proceeding, the prosecution has the burden of proving

9

"beyond a reasonable doubt[ ] that the petitioner is ineligible for resentencing." (*Id.*, subd. (d)(3).) Either party may present "new or additional" evidence. (*Ibid.*)

## B. The Trial Court Did Not Hold An 1170.95 (d)(3) Hearing and Engaged in Improper Factfinding at the 1170.95 (a) Hearing

Here Carr filed a petition, and both parties filed briefs on the issue of whether Carr established a prima facie case under section 1170.95, subdivision (a). The court set the case for a section 1170.95, subdivision (a) hearing. The court did not offer either party the opportunity to present additional evidence at the hearing. After the hearing, the court denied the petition pursuant to section 1170.95, subdivision (a). For all of these reasons, the record supports only the conclusion that the trial court evaluated Carr's prima facie case under section 1170.95, subdivision (a). It does not support the Attorney General's argument that the trial court held a hearing under section 1170.95, subdivision (d)(3), a hearing at which the prosecutor bore the burden of proof and either party could offer new or additional evidence. (§ 1170.95, subd. (d)(3).)

Our high court prohibited factfinding at the prima facie stage. (*Lewis*, *supra*, 11 Cal.5th at pp. 971–972.) In violation of this prohibition, the trial court concluded that Carr was a major participant who acted in reckless disregard for human life by drawing inferences favorable to the prosecution. Most significantly the court inferred that Carr was "prepared to use deadly violence with others he knew were also prepared to use deadly violence." The error prejudiced Carr because the record does not show as a matter of law Carr was ineligible for relief and Carr (and the People) should have the opportunity to present

10

"new or additional" evidence. (§ 1170.95, subd. (d)(3).) The court must issue an order to show cause and hold a hearing, at which it may evaluate as well, any additional evidence and the record facts.[2] (§ 1170.95, subds. (c) & (d).)

## DISPOSITION

The order denying Carr's petition for resentencing under Penal Code section 1170.95 is reversed. Upon remand, the superior court shall issue an order to show cause and hold a section 1170.95, subdivision (d)(3) hearing to determine whether to vacate Carr's murder conviction, recall his sentence, and resentence him.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.          CHANEY, J.

---

[2] We express no opinion on how the trial court should decide whether Carr was a major participant who acted with reckless indifference to human life. Because we remand for additional proceedings, we need not address Carr's argument that his age at the time of his crimes—21—potentially could have affected his ability to appreciate the risk posed by his criminal activities.